**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

THERESA MORRIS, ET AL     CIVIL ACTION NO. 09-1052

VERSUS         JUDGE ELIZABETH ERNY FOOTE

JOHN COKER, ET AL      MAGISTRATE JUDGE PATRICK J. HANNA

<u>**MEMORANDUM ORDER**</u>

   Cross motions for summary judgment on the issue of insurance coverage are pending before the Court.  [Record Documents 131 and 149].  This case arises out of an incident in which Plaintiff Bob Morris was struck by Jon Coker, an employee of Allis Chalmers. Defendant Illinois National Insurance Company ("Illinois National") issued an excess commercial general liability policy to Allis Chalmers Energy, Inc. ("Allis Chalmers"). For the following reasons, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment [Record Document 131] and **DENIES** Defendant's Motion for Summary Judgment [Record Document 149].

**I.**  **Facts and Procedural Posture**

   The event giving rise to this suit took place in the parking lot of the Riverside Inn, a restaurant in Lafayette, Louisiana, on August 27, 2008.  At that time, Defendant Jon Coker was working as a salesman for Allis-Chalmers, an oil company.  Plaintiff Bob Morris worked as a drilling consultant for Brigham Oil & Gas.  The event which brought the parties together was a lunch meeting to discuss an upcoming drilling project in which the two

companies would work together.  As the participants gathered for the meeting, Coker was

seated in the restaurant with a representative of Brigham Oil & Gas. When Morris arrived

at the parking lot of the restaurant, he called the Brigham representative. The parties'

characterization of what happens next differs.  Plaintiffs explain that:

> [u]pon realizing that Morris was the company man/consultant hired to oversee the
> drilling operations, Coker ventured outside to discuss and hopefully resolve any
> issues pertaining to his working relationship with Morris prior to the new business
> venture involving his current employer, Allis Chalmers. As Coker approached Morris
> with the intention of engaging in conversation, he spontaneously reacted when he
> saw 'Morris' eyes light up' and instinctively 'for some reason threw a punch.'

> [Record Document 131-1, pp.4-5].

Defendant paints the same event in a slightly different light:

> On the date of the incident, Coker arrived at the Riverside Inn restaurant, for a pre-
> spud meeting. Coker admitted that he knew Morris would be attending that
> meeting, but Morris had not yet arrived. Learning of Morris' arrival, Coker testified
> that he wanted to 'confront' him. He deliberately got up from the table where he
> was seated, exited the restaurant, spotted Morris—who was on his cell phone—,
> crossed the parking lot, and sucker-punched Morris in the head. Coker's attack sent
> the two men on the ground with Coker on top of Morris.

> [Record Document 149-6, p.3].

It is undisputed that Coker exited the restaurant, walked towards Morris, and punched him

in the face.

It is also undisputed that the relationship between Morris and Coker was stormy

before this incident.[1]  Some years back, Coker owned Coker Directional Drilling, a company

that did business with Brigham Oil & Gas.  On three separate occasions, Morris made clear

---

[1]As discussed below, the parties have differing views regarding whether the
dispute between the two men was business-related or caused by pure personal rancor.

that he thought Coker Directional Drilling was doing inadequate work.  [Record Document 131-2, p.10; Record Document 149-3, pp.45-58].   During one of these incidents, he claimed that a Coker employee was intoxicated on the job.  [Record Document 131-2, pp.13-15].   Coker testified that when he found out that Morris was going to be the company man at the Lafayette meeting, he felt panicky and was afraid that he might be assaulted by Morris.  [Record Document 149-4, p.10]. There was no history of prior physical violence between the parties.

Illinois National issued a commercial umbrella liability policy to Allis Chalmers. The policy covers liability for bodily injury caused by "occurrences." [Record Document 149-1, p.3].   The word "occurrence" is defined "as respects Bodily Injury" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [Record Document 149-1, p. 1]. The policy contains an intentional injury exclusion, which reads:

> This insurance does not apply to **Bodily Injury** and **Property Damage** expected or intended from the standpoint of the **Insured**. However, this exclusion does not apply to **Bodily Injury** or **Property Damage** resulting from the use of reasonable force to protect persons or property.

[Record Document 149-1, p. 10]. (emphasis in original).

The term "Insured" is defined in Section VII, Definitions, as:

1.  The **Named Insured**; [and]
2.  your employees... but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

Id. at 21. (emphasis in original).

In the declarations section of the policy, "Allis-Chalmers Energy, Inc." is listed as the

"Named Insured." Id. at 2. The Policy further specifies that:

> Throughout this policy the words "you" and "your" refer to the **Named Insured** shown in the Declarations and any other person or organization qualifying as a **Named Insured** under this policy...
>
> The word **Insured** means any person or organization qualifying as such under Section VII. Definitions.
>
> Except for headings, words that appear in bold print have special meaning. See Section VII. Definitions.
>
> Id. at 3. (emphasis in original).

Illinois National has filed a motion for summary judgment, arguing that Coker was acting outside the course and scope of his employment when he punched Morris; that the intentional punch is not an "occurrence" as defined by the policy; and that the intentional injury exclusion bars coverage.  Plaintiffs have moved for partial summary judgment on the ground that the intentional injury exclusion, and a number of other exclusions, do not bar coverage.

## II.    Applicable Law

An insurance policy is a contract between the parties, and it is thus construed using the rules of contract interpretation found in the Civil Code.  Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La. 1993).  When the words of an insurance contract are clear and explicit and lead to no absurd consequences, the contract must be enforced as written and no further interpretation may be made in search of the parties' intent. La. Civ. Code art. 2046; Peterson v. Schimek, 729 So.2d 1024, 1028 (La. 1999).  The plaintiff bears the ultimate burden of proving that the claim in question falls within the policy's coverage.  Doerr, et. al. v. Mobile Oil Co., et. al., 774 So.2d 119, 124

(La. 2000).   The insurer, however, bears the burden of proving that policy limits or exclusions apply. <u>Tunstall v. Stierwald</u>, 809 So.2d 916, 921 (La. 2002).  The purpose of liability insurance is to afford the insured protection from damage; therefore, claims and policies should be construed to effect, and not to deny, coverage.  <u>Reynolds v. Select Properties, Ltd.</u>, 634 So.2d 1180, 1183 (La. 1994).  The Louisiana Supreme Court has adopted a fact-intensive analysis of the insured's subjective intent to determine whether coverage is excluded under an intentional injury exclusion.  <u>Breland v. Schilling</u>, 550 So.2d 609, 613 (La. 1989).  In the event an insurance clause is found to be ambiguous, it must be construed against the insurer.  <u>Id.</u> at 610 (citing <u>La. Civ. Code</u> art. 2056).  "Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." <u>Id.</u> at 610-611 (citing <u>La Civ. Code</u> art. 2045).

Employers are liable for the "damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."  <u>La. Civ. Code</u> art. 2320.  In the leading case of <u>LeBrane v. Lewis</u>, the Louisiana Supreme Court held that an employee who commits an intentional tort exercised the functions in which they were employed if their conduct was:

> ...so closely connected in time, place, and causation to [the employee's] employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests.

292 So.2d 216, 218 (La. 1974).

To determine whether the conduct was "so closely connected in time, place, and causation"

to employment duties, the Court must consider the following factors:

1)  whether the tortious act was primarily employment-rooted;

2)  whether the violence was reasonably incidental to the performance of the
    employee's duties;

3)  whether the tortious act occurred on the employment premises;

4)  and whether the tortious act occurred during the hours of employment; Id.
    at 218; Russell v. Noullet, 721 So.2d 868, 871 n.6 (La. 1998).

Not every factor need be met in order to establish vicarious liability.  Miller v. Keating, 349
So.2d 265, 268 (La. 1977).  The determination of whether an employee's tortious conduct
is sufficiently employment-related is a mixed question of fact and law.  Russell v. Noullet,
721 So.2d 868, 871 (La. 1998).

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil
Procedure "if the movant shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a
defendant seeks summary judgment based on a claim or affirmative defense on which they
bear the burden of proof at trial, they "must establish beyond per adventure all of the
essential elements of the claim or defense to warrant judgment in [their] favor." Fontenot
v. Upjohn Co., 790 F.2d 1190, 1194 (5th Cir. 1986).

 When the moving party does not bear the ultimate burden of persuasion on the
claim at issue, they may meet their burden of production by offering affirmative evidence
in the form of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials proving that the non-moving party cannot show a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(a).  But in the absence of such affirmative evidence, the moving party may also argue that the record itself shows the non-moving party has failed to raise a dispute as to material fact. Celotex v. Catrett, 477 U.S. 317, 322-23, 325 (1986) (moving party may meet their burden of production by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.").  If the moving party carries its burden of production under Rule 56, the burden shifts to the non-moving party to show that there is a genuine dispute as to material fact for trial, either by pointing to or rehabilitating evidence already in the record, or by offering new evidence.  Celotex v. Catrett, 477 U.S. 317, 332-33 (Brennen, J., dissenting).

A genuine dispute for trial exists when a rational trier of fact looking at the record could find for the nonmoving party.  Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Co., 475 U.S. 574, 586-87 (1986); Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).  If the non-moving party makes an evidentiary showing of a genuine issue of material fact, then the burden shifts again to the moving party to show the inadequacy of this evidence.  Celotex, 477 U.S. at 332. However, if the non-moving party does not carry its burden, the court shall enter summary judgment against them. Fed. R. Civ. P. 56(a).

## III.  Analysis

If Illinois National is entitled to summary judgment on the course and scope of employment issue, then there is nothing more for the Court to consider. Accordingly, the Court will address this issue first.

### A.    Scope of Employment

The policy only provides coverage for "those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury..." [Record Document 149-1, p.3].  Thus, the policy only provides coverage if Coker was acting within the course and scope of his employment when he punched Morris.[2]  Although Coker's punch took place at a restaurant, it happened during a business meeting in which Coker was representing Allis Chalmers. Illinois National argues that Coker exited the business context when he stepped outside to meet Coker. It is undisputed, however, that Coker punched Morris during a business meeting. This argument of Illinois National is more appropriately considered under the analysis of whether Coker's actions were employment-rooted and incidental to his employment duties.  A reasonable jury could therefore find that the third and fourth

---

[2]As discussed below, there is a dispute regarding whether the term "the Insured" refers to only Allis Chalmers or to all defined "Insureds" under the policy. Under either interpretation of the term, however, the liability for Coker's action is covered only if he was acting within the course and scope of his employment. If "the Insured" refers only to Allis Chalmers, then Allis Chalmers would be liable for Coker's actions under a respondiat superier theory, which requires that Coker acted in the course and scope of his employment. If "the Insured" refers to Coker as well, under the policy definitions he is still only an "Insured" while he is acting within the scope of his employment.  [Record Document 149-1, p. 21].

LeBrane factors are met.

The question is then whether Coker's punch was primarily employment-related or personal in nature, and whether it was reasonably incidental to his employment related duties.  Illinois National cites a number of Louisiana appellate court opinions where physical altercations committed by employees on business property or during business hours were found to be purely personal in nature, because the disputes giving rise to the violence were not employment related, and thus not sufficiently employment-related.[3] There are also, however, Louisiana Supreme Court cases which find that a physical attack by an employee was sufficiently employment-related because of the employment-related nature of the dispute from which the violence arose.   In LeBrane, an employee fired another late employee. While ordering the fired employee off of the premises, the supervisor stabbed the employee. In holding that the supervisor's actions were employment-related, the court relied on the fact that the dispute from which the violence arose—a dispute surrounding the firing of the employee—was "primarily employment-rooted."   292 So.2d at 218. Similarly, in Benoit v. Capitol Mfg. Co.,  the Louisiana Supreme Court found that a physical altercation arising out of a dispute over whether to keep a door in the workplace open or closed was "clearly employment-rooted," and imposed vicarious liability on the employer.

---

[3]Scott v. Commercial Union Ins. Co., 415 So.2d 327 (La. App. 1982); McClain v. Holmes, 460 So.2d 681 (La. App. 1984); Barto v. Franchise Enter., Inc., 588 So.2d 1353, 1356 (La. App. 1991); Dunmiles v. St. Charles Parish Recreation Dept., 726 So.2d 485 (La. App. 1999); Hubbard v. Lakeland Nursing Home, 734 So.2d 1280 (La. App.1999); Ryback v. Belle, 753 So.2d 383 (La. App. 2000); Pye v. Insulation Tech., Inc., 700 So.2d 892 (La. App. 1997); Schwartz v. McNabb, 830 So.2d 1093 (La. App. 2002); Affeltranger-Cheramie v. Zachary,  757 So.2d 751 (La. App. 2000); Eichelberger v. Sidney, 771 So.2d 863 (La. App. 2000).

617 So.2d 477, 479 (La. 1993).

The parties dispute whether Coker's underlying dispute with Morris was entirely personal or whether it was employment-related. The Court finds, however, that Plaintiff has pointed to evidence from which a reasonable jury could find that the dispute is employment- related.  The deposition testimony submitted tends to show that the past disputes between the two men centered around the adequacy of work done by Coker's company.   [Record Document 131-2, p.10; Record Document 149-3, pp.45-58, Record Document 131-2, pp.13-15].  The two men had no relationship or contact outside of their professional lives.  Coker has testified that although he was worried that given his past history with Morris he would probably have an issue with him and "get run of [sic] that job," in the interest of business he intended to make this meeting "a new beginning" with Morris.  [Record Document 154, pp. 12-13]. Thus, Coker claims that when he walked outside to meet Morris he intended to make sure that Morris didn't have a problem with him and that he was not going to get run off of the job.  [Record Document 154, p.14]. While his explanation for what happened next does not make much sense—that he punched Morris when he saw "the light in his eyes"—the Court finds that Coker's version of the event, if believed, could support a finding that his actions were rooted in a desire to not get run off of this job.  Although Coker's explanation of his decision to punch Morris is difficult to understand, none of the violent actions of defendants found to have been committed in the course and scope of their employment are easy to understand. There was no need for the supervisor to stab the employee in LeBrane.  Nor was there any need for

the employee to smash his co-worker's fingers with the broom in <u>Benoit</u>.  The Court must not judge the credibility of a witness in a motion for summary judgment. It is sufficient to defeat Illinois National's motion that a reasonably jury could find that Coker's actions were rooted in a dispute related to the work they were about to undertake.  Coker claims that he believed that his actions were motivated by dispute that could be seen as business-related. It will ultimately be for the trier of fact to determine whether the Coker's actions were in the course and scope of his employment.

## B.    Intentional Injury Exclusion

The Court will next address the question of whether the policy unambiguously evidences the intent of the parties to exclude coverage for bodily injury intentionally caused by employees of Allis Chalmers.  If Illinois National prevails on this issue, then the Court need not address the remaining arguments. For the purposes of this discussion, the Court will assume that this event qualifies as an "occurrence"  under the definition of the policy.  Illinois National argues that even if Coker was acting within the course and scope of his employment, coverage is barred by the intentional injury exclusion.

The intentional injury exclusion reads as follows:

This insurance does not apply to **Bodily Injury** and **Property Damage** expected or intended from the standpoint of the **Insured**. However, this exclusion does not apply to **Bodily Injury** or **Property Damage** resulting from the use of reasonable force to protect persons or property.

[Record Document 149-1, p. 10]. (emphasis in original).

Defendant's argument for application of the exclusion is straightforward. Defendant simply points to portions of Coker's deposition where he admits that he intended to throw the

punch at Morris and that he knew that punching him could cause injury. Because Coker was an insured under the policy, the argument goes, coverage does not extend to the bodily injury intended or expected by him.

Plaintiffs counter that the exclusion applies only to bodily injury intended or expected from the viewpoint of Allis Chalmers and not from the viewpoint of Coker. Because there is no dispute that Allis Chalmers did not intend to injure Morris, there is no question that the exclusion does not apply. This argument requires interpreting the words "the Insured" in the exclusion to refer only to Allis-Chalmers, a "Named Insured" under the policy, and not to Coker, an employee of Allis-Chalmers.  The definitions section of the policy specifies that the term "Insured" refers to employees acting in the scope of their employment. [Record Document 149-1, p. 21].  Plaintiffs rely on a line of state cases interpreting the words "the insured" found in a number of insurance policies.  They argue that these cases establish that the words "the Insured" are ambiguous and therefore must be construed against the insurer. Plaintiffs also argue that interpreting  "the Insured" to refer to Allis Chalmers is consistent with sound commercial practice: it makes sense that Allis Chalmers would seek to insure itself for the intentional acts of its employees for which it could be held liable.

In Osbon v. Nat'l Union Fire Ins. Co., the Louisiana Supreme Court  found the words "the insured" used in an arson exclusion in the statutory form fire policy to be ambiguous because it could refer to "the named insured, any insured as defined in the policy, or the particular insured seeking coverage who commits an act triggering the exclusion or

condition." 632 So.2d 1158, 1160 (La. 1994).  The policy that was actually issued, as opposed to the statutory form,  defined "insured" as "residents of your household who are: ... a. your relatives." Id. at 1160.  Because the arson was committed by the plaintiff's husband, the exclusion would have applied had the court upheld the issued policy. Id. at 1160-61.  The court, however, held that because the issued policy deviated from the standard fire insurance policy form, "reformation of the policy to conform with the standard fire policy form" was necessary. Id. at 1161.  Interpreting the standard policy form, in which the term "the insured" was not defined, the court relied on the definition of the word "the" in Black's Law Dictionary (6th ed.) to hold that "the  insured" refers only to the specific insured who is responsible for causing the loss and is seeking to recover under the policy. Id.

Similar reasoning was used in Bonin v. Westport Ins. Corp., a case interpreting the fraudulent act exclusion of a professional liability policy. 930 So.2d 906 (La. 2006). The exclusion read:

> This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from: A. any criminal, dishonest, malicious or fraudulent act, error, omission or PERSONAL INJURY committed by an INSURED.
>
> 930 So.2d 906, 910 n.3.

In Bonin, both the insured lawyer and his employee committed fraudulent acts, but the plaintiffs attempted to narrow their claim to only cover the fraudulent act of the employee. The policy defined "INSURED" to include "any non-lawyer who was or is an employee of the NAMED INSURED," a definition that the court acknowledged would include the

employee.  Id. at 913.  Unmoved by plaintiffs' artful pleading, the court declined to focus on the actions of the employee and, relying on Osbon, held that the term "an INSURED" referred to any defined insured under the policy.  Id.  Thus, the fraudulent actions of the attorney triggered the exclusion so long as Plaintiffs' claim "arose out of" those actions.  Bonin makes clear that the distinction between the terms "an insured," "any insured," and "the insured" are meaningful in interpreting similar exclusions.

Plaintiffs also cite the older cases of Rivers v. Brown, 168 So.2d 400 (La. App. 1964) and Baltzar v. Williams, 254 So.2d 470 (La. App. 1971).  In Rivers, the plaintiff was pistol whipped and kicked by an employee of the insured.  168 So.2d at 401.  The policy exclusion language read "assault and battery shall be deemed an accident unless committed by or at the direction of the insured."  Id.  The court held that the phrase "unless committed by or at the direction of the insured" referred only to the named insured.  Id.[4]  To hold otherwise, the court reasoned, would be tantamount to denying the entire purpose of the defendant obtaining insurance—that is, to insure itself against bodily injury caused by its employees.  Id. at 401-02.

In Baltzar, the plaintiff was injured during "an illegal arrest by a firearm" wielded by a deputy town marshal for the City of Glenmora.  254 So.2d at 471.  The policy covering the town did not contain any applicable exclusion, and employees were not defined as an

---

[4]The court relied on Barringer v. Employer's Mut. Liability Ins. Co.,which held in dicta that although the policy defined "insured" as both the employer and the employee, the language "at the direction of the insured" referred only to the named insured because otherwise the purpose of the insurance policy would be negated.  62 So.2d 173 (La. App. 1952).  The policy in Barringer had exclusionary language identical to the language in the policy in Rivers.

"insured."  Id. The policy only covered injuries caused by an "occurence," however, which was defined as:

> ...an accident including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Id. at 472.

Because the only "insured" defined by the policy was the Town of Glenmora, the court had no trouble concluding that the injury was not intended "from the standpoint of the insured."  Id.  The Court went on, however, in dicta to hold that the cases discussed above, along with others, establish a public policy that absent "a specific exclusion and resulting intelligent waiver by the employer" similar insurance policies should be construed to give employers coverage for intentional acts of their employees.  Id. at 473.

In McBride v. Lyles the court held that a policy excluding coverage of "bodily injury or property damage which is either expected or intended from the standpoint of the insured" covered an insured party that was vicariously liable for the intentional acts of another.  303 So.2d 795 (La. App. 1974).  The case involved a fight during which sons of the defendant fathers injured the plaintiff.  Both fathers and sons fell under the definition of "insured" in the policy.  Relying on Baltzar and Rivers, the court held that the phrase "the standpoint of the insured" in the exclusion referred only to the fathers.

In Brown v. Menszer, the Eastern District of Louisiana found that an exclusion for bodily injury or property damage that is "expected or intended from the standpoint of the insured... or which is the result of willful and malicious acts of the insured" did not exclude

coverage for respondeat superior liability for the intentional conduct of an insured employee.  No. Civ.A. 99–0790, 2000 WL 1210824 at *3-4 (E.D. La. 2000). The court relied on Rivers  and Mcbride, and drew a distinction between the terms "any insured" and "the insured." Because the clause used the phrase "the insured," the court held that it referred only to the named insured, though the employee was also an "insured" as defined by the policy.  The court also found that the provision was at best ambiguous, and therefore should be construed against the insurer.  To interpret the exclusion any other way would defeat the corporation's purpose for securing business liability insurance.

The Louisiana Civil Law Treatise, analysing the above caselaw, concludes that Louisiana courts interpreting intentional injury exclusions distinguish between the intention of employees of an insured entity and the intention of the entity as manifested in by its managing officers.  15 Williams Shelby McKenzie & H. Alston Johnson, III, Louisiana Civil Law Treatise, Insurance Law & Practice § 6:7 (4th ed.).  The treatise concludes that intentional acts of employees do not fall within the exclusion, while intentional acts of the entity who procures the insurance do fall within the exclusion.  The Fifth Circuit case of Ashland Oil, Inc. v. Miller Oil Purchasing Co., also recognizes this distinction.  678 F.2d 1293, 1315-19 (5th Cir. 1982).

In response, Illinois National first argues that the term "insured" in the cases summarized above was not a defined term in those policies.  A careful review of the cases, however, reveals that only in Baltzar and Osbon was the actual tortfeasor not included in the definition of the term "insured."  Defendant also points out, accurately, that the policy

language in <u>Rivers</u> differs significantly from the policy at issue here, covering liabiliy for assault and battery unless it was done "at the direction of the insured." 168 So.2d at 401. The language in <u>Rivers</u> suggests that the term "the insured" referred to the organization that procured the insurance, because the policy clearly contemplated coverage for assault and battery committed by some insured party, and the insured most likely to "direct" that an assault or battery be committed was the named insured. The language at issue in <u>Baltzar</u>, <u>Mcbride</u>, and <u>Brown</u>, however, is nearly identical to the language in the instant policy; and the policies in <u>Brown</u> and <u>McBride</u> included employees within the definition of the term "insured."  Furthermore, the Louisiana Supreme Court recognized in <u>Bonin</u> that what article is placed in from of the term "insured" may be dispositive for how the term is interpreted. And finally, in <u>Baltzar</u>, a Louisiana appellate court found, albeit in dicta, a public policy in favor of construing intentional injury exclusions to provide coverage to a named insured for vicarious liability  for torts of their employees. Thus, the jurisprudence cited by Plaintiffs cannot be disregarded as inapposite.

Illinois National argues that the jurisprudence does not apply to this policy because here the term "Insured" is not ambiguous. It is defined to include employees acting within the scope of their employment. Thus, simply substituting the definition of "Insured" for the term in the intentional injury exclusion unambiguously shows that it excludes injuries intended by employees.  The policy, however, must be interpreted as a whole.  <u>La. Civ. Code</u> art. 2050.  Defendant argues that the terms "the insured" and "an insured" are used throughout the policy, and to apply a fixed definition to each phrase without consideration

of the context in which it appears would be absurd.  The terms "the Insured," "any Insured," and to a lesser extent "an Insured" are used frequently in the policy.  The context in which these terms are used suggests that the term "the Insured" generally refers to Allis-Chalmers—the insured business organization that employs and directs the actions of others.[5]  Only in one other portion of the policy—the personal injury and advertising injury exclusion—however, does an exclusion turn on the state-of-mind or some other attribute of "the Insured." This exclusion reads in pertinent part:

This insurance does not apply to Personal Injury and Advertising Injury:

1.     caused by or at the direction of the **Insured** with the knowledge that the act would violate the rights of another and would inflict **Personal Injury** and **Advertising Injury**;

2.     Arising out of oral, written or electronic publication, in any manner, of material if done by or at the direction of any **Insured** with knowledge of its falsity...

4.     arising out of a criminal act committed by or at the direction of the **Insured**;

_____

[5]For example, the Employers' Liability Limitation Endorsement reads: "This insurance does not apply to Bodily Injury to any employee of the Insured arising out of and in the course of the employee's employment by the Insured." Id. at 61. See also pp. 62-63 (contemplating "the Insured" having an ERISA plan and "an Insured" being an administrator of such a plan), p. 64 (referring to "the Insured's normal operations of generation, transmission or distribution of electricity"), p. 71 ("This insurance does not apply to Bodily Injury to any employee of the Insured arising out of and in the course of the employee's employment by the Insured... This exclusion applies: whether the Insured may be liable as an employer or in any other capacity..."). The term "Named Insured" is generally used when the policy refers to the legal owner of property, such as a working interest in mineral rights, or the party who holds the right to terminate or alter the policy or who is obliged to pay the policy premiums.  [Record Document 149-1, pp. 16-19 and 47]. The term "any Insured" is generally used to refer to both the business organization and all other "Insureds" under the policy. See e.g. Id. at 66 (contemplating "any Insured" driving an automobile).

5.      for which the **Insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement;

Id. at p.14. (emphasis in original).

The first sentence states that the exclusion will apply when "the Insured" knew that the act causing injury would violate the rights of others.  The second sentence states that the exclusion will apply if "any Insured" knew that material they published that caused injury was false. This exclusion does not illuminate the nature of the term "the Insured" because it does not conclusively show that the term "the Insured" and "any Insured" mean either different things or the same thing.  Both sentences can be read together consistently with either meaning of the term. If the terms both refer to both Allis Chalmers and its employees, then the first sentence excludes non-publication acts by employees only if the actor knows that they violated the injured parties rights.  If "the Insured" only refers to Allis Chalmers, then it means that acts of employees other than publication that the employees know cause injury to others are not excluded.  Both interpretations are possible, and indeed they raise the same general question as the intentional injury exclusion—whether a state-of-mind that an employee has but Allis Chalmers does not have bars coverage for an injury caused by the employee.

Given that one result is reached by simply substituting the definition of the term for the term in the exclusion and that a different result  is reached by analyzing the use of the term in other clauses, the Court finds that the term "the Insured" in the exclusion is ambiguous and therefore must be construed against Illinois National.  This finding is

consistent with the holding of the state courts and the Fifth Circuit in the above discussed cases that CGL policies using the term "the Insured" should be construed to provide coverage for injury intended by employees in the scope of employment.  Viewing the exclusion from the standpoint of Allis Chalmers, there is no evidence indicating that Allis-Chalmers expected or intended the injury to Morris; therefore Illinois National's Motion for Summary Judgment on the exclusion must be **DENIED** and Morris' Motion for Summary Judgment must be **GRANTED** regarding the exclusion.

### C.    Accident or Occurrence

Finally, Illinois National argues that summary judgment is appropriate because this event does not qualify as an occurrence.  The term "Occurrence" is defined in the policy as:

> an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence.

[Record Document 149-1, p.23].

Illinois National argues that the punch is not an accident because it was intended by Coker. For the purposes of this analysis, the Court will assume that Coker intended to punch Morris.

The parties dispute whether the court must determine whether an event is an accident from the perspective of the victim of the event or by asking whether the event is the result of an unreasonable and intentional action. Illinois National derives the "unreasonable and intentional action" test from the Fifth Circuit's opinion in Adams v.

Unione Mediterranea Di Sicurta 220 F.3d 659, 677-78 (5th Cir. 2000).  In Adams, the Fifth

Circuit held that an intentional and unreasonable transfer of possession of steel by the

insured company was not an accident under the definition of accident in a policy with

language similar to the instant policy.  The Fifth Circuit relied on the definition of accident

in Black's Law Dictionary 15 (6th ed. 1990):

> a fortuitous circumstance, event, or happening; an event happening without any
> human agency, or if happening wholly or partly through human agency, an event
> which under the circumstances is unusual and unexpected by the person to whom
> it happens....
>          Id.

Finding that the intentional transfer was not "fortuitous," the Fifth Circuit held that it was

not an accident.  Id.[6]  In response, Plaintiffs cite a number of state and federal court

decisions that analyze the event from the perspective of the.  Tsolainos v. Solainos, 59

F.Supp. 2d 592 (E.D. La. 1994), Ashland Oil, 678 F.2d 1293 (5th Cir. 1982), Markel Am.

Ins. Co. v. Schubert's Marine E., Inc. CIV.A.  04-376, 2007 WL 54808 (E.D. La. 2007), Doe

v. Breedlove, 906 So.2d 565 (La. App. 2005). Similarly, in Western American Transp., LLC

v. Morrow another court in this district relied on Adams when it declined to determine

whether the intentional act of an insured entity was an accident from the perspective of

the victim.  2006 WL 2375625, at *30-32 (W.D. La. 2006) .

       To rule on the instant motions, the Court does not need to resolve this dispute

regarding the legal standard because the Court finds that this event would constitute an

---

[6]The analysis conducted by the Fifth Circuit suggests that the court chose to
disregard the portion of the Blacks definition referring to the perspective of the victim of
the event.

accident viewed either from the perspective of the victim or under the analysis used in the

Adams case.  It is undisputed that Morris viewed being suddenly punched in the face as

an unusual and unexpected event. Thus, there is no question that the accident test would

be met from Morris' perspective.

Regarding the test advocated by Illinois National, Adams and Western American

Transp., LLC do not hold that bodily injury caused by an intentional act of an employee of

an insured business entity falls outside of the policy definition of accident. While Illinois

National argues that Adams must be read to "apply to unreasonable and intentional acts,"

this cannot be the case for all intentional acts. Adams does appear to hold that an

intentional and unreasonable act of the insured business cannot be considered an accident

under the CGL policy at issue; but it does not hold that intentional acts of an employee of

the business cannot be considered an accident.  A standard determining whether an event

is an accident must include consideration of the issue of perspective. The same event is

an accident to one participant, while another participant may view it as a normal

occurrence.[7]

The Court is persuaded that the instant policy covers such acts by employees for

which the business is liable. As defendant points out, the standard CGL policy previously

---

[7]Whenever an entity, such as a business organization, relies on persons capable
of intentional action and free choice to carry out its will, it is possible that it will intend
to do X but actually end up doing Y because of the unpredictable intentions of its
agents. In this situation, the actions of the agents are not an accident when viewed
from their perspective, but may be an accident when viewed from the perspective of
the entity.

included the intentional injury exclusion language within the definition of "occurrence."[8]

Some of the cases that hold that an employer is covered by the CGL policy for intentional

torts of his employee interpret the old "occurrence" definition. See e.g. Baltzar v. Williams,

254 So.2d 470 (La. App. 1971).  Those cases held that incident causing injury must viewed

from the perspective of the employer seeking coverage, not from the perspective of the

employee. Now that the intentional injury language has been made its own exclusion,  it

would be inconsistent to interpret the remaining portion of the occurrence definition more

narrowly than it was interpreted previously—that is, as now requiring analysis of whether

event was unexpected from the perspective of employee. Viewed from the perspective of

both  Morris and Allis Chalmers, there is no dispute that this punch was fortuitous and

unexpected.

**D.    Other Exclusions**

Plaintiffs also move for summary judgment on the Professional Liability Exclusion,

the Employer's Liability Exclusion, the Marine Employers Exclusion, and the Employee Lease

Agreement Exclusion.  [Record Document 131].  As they do not bear the ultimate burden

of proof on these exclusions, Plaintiffs need only point to the absence of evidence in the

record showing a dispute of material fact.  Celotex, 477 U.S. at 325.  In response, Illinois

National has pointed to no evidence in the record that raises a genuine dispute of material

fact regarding these exclusions.  Accordingly summary judgment is warranted for Plaintiffs.

---

[8]For an explanation of the intentional injury language's migration from the definition of occurrence to its own exclusion, see 15 Williams Shelby McKenzie & H. Alston Johnson, III, Louisiana Civil Law Treatise, Insurance Law & Practice § 6:7 (4th ed.).

**IV.     Conclusion**

For the foregoing reasons,

Plaintiff's Motion for Partial Summary Judgment [Record Document 131] be and is hereby **GRANTED**; and

Defendant's Motion for Summary Judgment [Record Document 149] be and is hereby **DENIED**.

Whether Coker was acting within the course and scope of his employment, a mixed question of law and fact, remains to be decided by the finder of fact.

**IT IS SO ORDERED.** February 11, 2013.


ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE